Can we call the first case please? 14-407 People v. Norman Ybarra. Will counsel presenting argument today please step up and introduce yourselves. If you could spell your last names, we'd appreciate it. Good morning, Your Honor. I'm Jennifer Bontrager, B-O-N-T-R-A-G-E-R, from the State Appellate Defender for Monta Navarro. Good morning. Good morning, Your Honor. I'm Eric Lee Bled, L-E-A-F-B-L-A-B for the People. Good morning. We are going to allocate about 15 minutes per side. We will try to stay reasonably strict with that. Ms. Bontrager, would you like to reserve some time for rebuttal? Yes, please. Just a few minutes. Okay. That'll be fine. You can proceed when you're ready. Thank you. Good morning. May it please the courts. Again, I'm Jennifer Bontrager from the State Appellate Defender for Monta Navarro. Your Honor, everything about this case is a tragedy, from the gang war and the daily violence that it brought to the area, to the shooting, but also to Martin himself. Exposed to cocaine and nicotine in utero, Martin was born into destitute poverty in a poisoned and violent neighborhood to violent and drug-addicted parents. Martin watched his father beat his mother, and his mother and sister beat each other, all while lacking basic needs like food, shelter, and clothing. Poisoned by his mother's drugs and toxic chemicals in the air around his home, Martin developed significant cognitive and social and behavioral deficits. His full-scale IQ is 75. He was enrolled in the ninth grade at age 20. He cannot solve basic problems, lacks basic skills like math and reading. He cannot even buy all of the items off of a list from a corner store. He does not develop strong relationships. He's eager to fit in. He's an easy scapegoat. He's a follower. And I will quote from the mitigation report, he's a gang leader's dream because he is so easy to manipulate. And yet the trial judge in this case could weigh none of this powerful information at sentencing before imposing the most serious sentence available, the most severe sentence possible in Illinois. In this case, though, which is, I agree with you, tragic all the way around. Yes. The judge actually indicated that were the law to change, were he to have the ability to consider all the mitigation and aggravation, and then he said, actually, I will do that. And then he considered everything. And then he said, based upon my review of everything that's been presented, in this particular case, I would still sentence you to life in prison without parole. So has he already had this hearing? And what is your response to that? Well, I said, no, he has not had that hearing, Your Honor. The mitigation report, the detailed mitigation report that was worked up when the case was still a capital case, was tendered in court that day. And the court had no opportunity, the judge had no opportunity to actually review it. And there's no indication that he did. He never passed the, like, he never took a recess, he never passed and recalled the case. Did he say it at the hearing? He said he considered everything. I'm sorry. Yeah, I mean, he actually said, I considered everything. He did, but he couldn't possibly. He did, he said it, but he didn't. He said, I considered all the evidence in aggravation and mitigation. Okay, so what does that mean? On this record, it does not include that mitigation report, Your Honor, unless he was reading it while the parties were, while the State was arguing in aggravation. But there's no indication. In other words, then his findings reflect all aggravation. They reflect no mention of anything in this mitigation report. And it's all very powerful mitigation. Yes, and you've recounted for us, and the record indicates all of what you've mentioned. Yes, in that report. Yes. Right, and it's part of the record. It is, yes. And so the way it got into the record was because it had been part of the trial. It was tendered at that sentencing hearing, yes. Yes, but it had been filed before that, had it not? No, it was filed that day. Okay, so without an opportunity for the judge to actually review it. Plus, how do we know he didn't review it because he said he looked at everything? Again, there's no time for him to do so unless he's reviewing that and ignoring what the parties are saying while they're talking. I mean, it's tendered right there. There's no passing and recalling. There's no, let me take a few minutes. There's zero in the record demonstrating that he reviewed it, that he actually looked at that document. He mentions the PSI, but the PSI lacks all of this detail. Well, didn't the lawyers make arguments then after it was tendered? That's normally the procedure. The parties step up, set for hearing. Sentencing is going to be imposed. One side makes a recommendation. They point out an innovation. The defense then proceeds. They put in their mitigation. They argue why they think another sentence is appropriate. And then after that, the judge actually proposes that. Isn't that what happens? Generally, that is what happens. Here, the parties gave fairly brief statements. The state argued briefly in aggravation. The defense really simply stood up and said, you know, we acknowledge the mandatory nature of the sentence in this case, Your Honor. We do hope that the law will change and that at some point, you know, we'll be able to ask for a different sentence. But they did not even ask for a sentence other than natural life. They simply recognized that the judge's hands were tied. And they were. Exactly. And so, no, counsel did not, as in a typical hearing, defense counsel did not discuss the mitigation at length. She simply proffered this report so that it would be in the appellate record. And that's where we are here. Plus, and I go back, too, to. So there was no statement at all by the defense attorney? She gave a brief statement, and I apologize without my notes to see exactly what it was that she said. She spoke very briefly, saying we acknowledge that Your Honor's hands are tied. We have tendered this, and we do hope that the law will continue to change following Miller v. Alabama. We hope that it will continue to change in a direction that will allow Martin to at some point have a different sentence available to him. But that was it. The defense attorney did not argue any of the facts that were included in that detailed report at all. And the judge's findings reflect no review of that report either. They reflect that he speaks briefly about the aggravation in the case. He emphasizes the aggravation in the case. He does not mention anything from the mitigation report. To further underscore that he simply had no time to review it and could not have reviewed it. Counsel, how do you distinguish the level of participation of the defendant in his crimes compared to some of his cases that you cited that found proportionate penalty violations? He is the shooter. And that is certainly distinct from this Court's decision in, say, House. But the defendant in Peeble v. Gibson, he was the shooter. In Peeble v. Aikens, he was also the shooter.  Yes, we have him as the shooter here. But again, he is not an average 20-year-old. But in Gibson, there was only one attempted victim. Nobody died. And the trial judge said, I wish I could give you less, but I can't. My hands are tied. Right. We have sort of the opposite here, right? Actually, similarly to the defendant in Gibson, we do have also a history of psychological disorders, some serious deficits. That's true. That's all present here. I mean, as far as, you know, Martin bears all the hallmarks, all the transient hallmarks of these. He is certainly immature, both cognitively and socially. His background, his developmental background is horrific. We know he's been significantly delayed. His characteristics, he is a follower. This is not a carefully planned crime. Well, this kind of is one of those situations where I suppose one could argue that in the sense that he, you know, pulls out an AK-45, mows down three kids. Yeah, I mean, I don't know. There are a lot of cases like this one that I'm familiar with recently, not that it hasn't happened. But at the same time, this case suggests premeditation, planning. He actually called his sister, didn't he, in advance, said, get the thing. She got the gun. She brought it out to the car. So, I mean, you know, you could argue this one both ways. But let's go back to the Gibson case. Wasn't part of the court's decision based on the fact that the trial court said that that individual was marginally fit? Yes, they were. That's not the law. You can't be marginally fit. So part of that case certainly rests on that. And I think as Justice Ellis pointed out, there was no murder there. The judge didn't want to give the mandatory sentence, said his hands were tied. But going back to this thing about the judge, the defense counsel in this case did note evolving jurisprudence. Exactly. And sought to make a record if changes would potentially impact this life sentence. And so my understanding of the record was that the trial court did honor the request, and he said he was conducting a balancing test should the evolution of the sentencing laws occur. The court specifically stated on record that it considered all factors in aggravation and mitigation, which the court is well aware of. I'm considering the arguments of counsel, obviously the evidence of trial, pre-sentence investigation, victim impact statements. Wasn't everything that you were talking about earlier in the pre-sentence investigation? Not at all, Your Honor. What was it in? It was in a document that as it was tendered was entitled draft mitigation report. Oh. And that's the one thing the judge left off his list. And the jurisprudence in this area as it continues to evolve requires more than just a listing off of, oh, I considered these things. It requires affirmative consideration of the individualized characteristics of the youthful offender. Now, one of the cases you rely on is House. Yes. Which I'm intimately familiar with. Yes. Having been the author. Yes. And in that case, one of the questions, it was a post-conviction matter. Right. And one of the questions was whether or not he actually had stated a claim for a constitutional violation for third-stage purposes, because in that case the individual was 19, had just turned 19 in a month at the time of the offense. And he was actually found guilty under an accountability theory. And generally speaking, if you're accountable and you get mandatory life, it certainly could be argued that the shooter who actually pulled the trigger and gets the same sentence, there's actually possibly a challenge regarding it being applied to the accountable person versus the actual trigger person. Do we have that kind of situation here? As far as? Well, do we have an accountability issue, or is this the actual, we have a person who actually fired the weapon? We do have, Martin, just the shooter. We can't contest that on the facts here. But, I mean, there are different facts in all of these cases. That's why it's an as-applied proportionate penalties challenge. And given the development of the case law in this area, we're just asking to extend a little bit farther, you know, extend a little bit farther than House. Is it really, though, kind of a legislative function? I mean, the legislature sets the standards, but, I mean, this Court in House found a proportionate penalties violation. It's been found repeatedly in Gibson and Aikens and Nieto, even in people versus Leon Miller. So, yes, the legislature is supposed to be setting these things, but the legislature has been slow to react and recognize, and this is where we push for that change to occur. Was Gibson an accountability case or not? He, I believe, was charged as a shooter, and he was accountable for the second victim, I believe. So, yes, he was a shooter. In Nieto, the defendant there was a shooter. He shot two people. He bragged, in fact, about the shooting later. He was, the firearm enhancements, the fact of life sentence, firearm enhancements, and consecutive sentencing all found proportionate penalties violation. Is there anything, do you think, that would actually prevent a subsequent hearing should the legislature change the law in this case? Because Mr. Ybarra has actually preserved this issue. Would there be any problem down the road if he were to make this challenge? I'm not sure. I guess it would depend on the legislation, and I guess based on your Honor's decision, it might be res judicato. I don't, I simply am not sure without, I don't know. Are you aware of legislation in other states where the law is that if someone is actually given mandatory life, that, and under certain ages, that the statutes of the state mandate that after 40 years or so, the individual should be at least entitled to a hearing to determine whether or not they should be released? I believe there is legislation like that in a couple of states. I know, I believe Massachusetts has a statute like that. I think Rhode Island has one, and I apologize. I simply don't have that information, but I do know that there are statutes, there are similar provisions out there in other states. So other than House and Gibson, is there any other case that you think we should look to to support your position? I mean, the cases cited in the base, I mean, the recent, I did a motion to set additional authority in Aikens, again, a proportionate penalties violation for the firearm enhancement. Was that issued by Justice Harris? Or was it Justice Connors? Justice Connors who wrote that decision? Maybe. I'm sorry, I don't have it in front of me, and I didn't write the decision down, I'm sorry. Connors, sounds familiar? Let me ask you this. There was some reference in the mitigation report that this individual would be a gang leader's dream. Yes. He's easily manipulable. Is there anything in this record to suggest that, in fact, he was manipulated? That this wasn't his idea, that somebody above him said, you must do this, and he said, okay, yes, sir. We don't have any affirmative evidence of that, but we don't have any affirmative evidence to the contrary either. I mean, he was with other people when the shooting occurred. We know somehow it was communicated to him. We, I guess, surmise that somehow it was communicated to him that there were fights at the school earlier. We know he was part of this ongoing gang war. And we do know that the other, his sister's boyfriend, Fofo, was a higher-ranking member, was involved and kind of helped Martin get away afterwards. I think those are all indications that he is not the mastermind of this, in addition to all of the other facts in that mitigation report indicating that he is extremely unlikely to have been involved in any planning, given his inability to solve basic tasks. But what about getting the gun? Calling his sister, saying, I need the thing. Get the thing. And then she actually gets the AK-45 and brings it out to the car. And then later the father hides it for him. Sure. His father. It really cuts both ways as far as not being able to plan in this case. When you call up and get the gun ready in advance. I mean, calling to pick up a gun is pretty minimal planning as far as that goes. And there's no indication that the shooting was his idea. No, but he's the only shooter. He is the only shooter. And these were three kids. I know. Children, I should say. Yes. Unarmed. Yes. Like you said at the beginning, very tragic all the way around. Everything about it, Your Honor. I see them over my time. Thank you. Okay. We'll reserve some time for your rebuttal. Mr. Leifblad, whenever you're ready. Thank you, Your Honor. May it please the Court. I'm Eric Leifblad. I'm an Assistant State's Attorney. I represent the people of the State of Illinois. The 20-year-old defendant was sentenced to mandatory natural life in this case because he hunted down and assassinated three teenagers as they were leaving Bowen High School. He now claims that his sentence is unconstitutional because the statute prevented the trial court from considering personal mitigating circumstances, including his family life and his alleged intellectual deficits. The primary problem with the defendant's challenge in this case, Your Honors, is that it's calling for this Court to contravene established Illinois Supreme Court precedent. And that precedent states that mandatory natural life for adults is constitutional. And that can be found in Papal v. Taylor, and recently also in Papal v. Leon Miller, where the Supreme Court reiterated that mandatory life sentence was constitutional as applied to adults under the Proportionate Penalties Clause of the Eighth Amendment. This Court, as you know, is bound by the Illinois Supreme Court decisions, and no matter how much the defendant disagrees with that precedent, we are bound by that here. So you do agree that there is sort of an evolution going on in the whole idea regarding mandatory sentences in general, don't you? I would agree with that statement, Your Honor, as to juveniles. In this case, do you agree with counsel that this mitigation report that was prepared was tendered immediately before the judge imposed the sentence? Your Honor, I was in the courtroom when it was tendered. I was trial counsel. All right. So would you give us your accurate sort of reflection of how everything occurred? Absolutely. Your Honor, Gina Piemonte was the lead, the public defender in this case, assisted by Mark Douglas. And myself and Tom Dierman and Adam, the civilian, were the trial counsels for the prosecution. And at sentencing, we were surprised because of the mandatory national life aspect of this case that Ms. Piemonte would actually tender this draft mitigation report, but it was tendered. Well, wasn't it prepared because these charges stem from the murders in 2009, don't they? When it was a death penalty case, Your Honor. Right. That's where that mitigation report was prepared. Right. So it had been prepared, was available, and was actually created some years before the actual sentence. All right. Go ahead. And then it was tendered in court in addition to the pre-sentence investigation, and Judge Grobel had an opportunity to review that. And he made a very careful ruling in this case, Your Honor. To review what? He reviewed the PSI, and he also reviewed the draft mitigation report. It was an 11-page document. He reviewed the mitigation report. He did. It was part of the ruling. And he references the fact that he conducts that balancing test, and that's the important distinction that we have in this case. Despite the fact that he was still bound with this defendant to sentence him to natural life, he still did that balancing test, acknowledging the fact that, as Your Honor noticed, or brought up, that it is an evolving part of the law currently. And he said that if the law were to change, I will honor your request and make a balancing test now. Correct. What was in the pre-sentence investigation? Just a shorthand recall. Well, the pre-sentence investigation, Your Honor, is as you put it there. I know what it contains. I'm asking you whether the information that was in the pre-sentence investigation is pretty much what was in the mitigation packet. That's correct, Your Honor. All right. So what is your shorthand recollection of what is actually in there regarding mitigation for Mr. Ibarra? I remember, Your Honor, that there was conversations about the fact that it was a very chaotic home life for Martin Ibarra. There was also some references to a low IQ. I also remember the fact that based upon that that part of Chicago is near where the steel mills were, that there was perhaps some lead poisoning. Does the PSI always contain convictions if there are any, juvenile record if there isn't any? That is correct. Education, how far the individual went to school. Yes. Drug, alcohol, history of any sort of abuse regarding controlled substances. And the defendant's version of events, if there were any. All right. And other factors regarding the actual family. That's correct. Okay. All right. So go ahead with what happened at the sentencing hearing that you were present. At the sentencing hearing, we presented live testimony in the form of victim impact statements for two of the victim's families, and that would be Raheem Washington and Johnny Edwards. For Kendrick Pitts, we didn't have a family member to provide any aggravation. After that, that's when the mitigation report was tendered. Prior to the beginning, both sides had a copy of the PSI. Judge Goldwell went over that with the parties asking us if we had any changes, corrections, or deletions to that, and he then made his ruling. But he didn't mention the mitigation package, correct? Specifically, no. But he did have it? He did. All right. After you or the other attorney from the State's Attorney's Office spoke, what did the defense attorney do, the assistant public defender? She made reference on the record to the fact that she had tendered this report, and she mentioned the fact that it was a document that I believe, off the top of my head, Your Honor, I believe she said that it was an 11-page document, and the fact that she's tendered it because of the fact that she also believes that Eighth Amendment jurisprudence is evolving in this area, involving young or youthful offenders. Can't an argument be made that a 20-year-old or a 19-year-old who kills two, three people, and then is sentenced to mandatory life in prison, is going to always, or for the most part, do more time than, say, someone who's 30, 35, 40, a very hardened criminal who actually does the same thing, kills more than one person, and then is sentenced to mandatory life, they're going to, based on mortality statistics, they're going to spend less time in prison than the 20-year-old. That's the numbers, Judge, and that's the order of justice. Right, so can't you make an argument that there's a denial of equal protection when you're always going to be doing more time, just because you're younger when you commit the horrific crime that was present here? However, Your Honor, this Court in the Illinois Supreme Court has spoken to this very issue as far as multiple homicides involving offenders like Martin Abar. Now, have they ever actually talked about any case that the average hardened criminal who gets a life sentence mandatory because of two deaths is going to actually do less time than the individual, the young person who's 20, who commits the same kind of crime? I believe Your Honor included that in the Antonio House opinion. I think there was some conversation and some writing about that very fact. Yes, but can't that argument be made? And I don't know that the Supreme Court has actually addressed that in any of the cases. They've certainly said that it's constitutional. Well, in an equal protection context, I am not aware of anything. What about the fact that this individual does have obviously some significant issues regarding his IQ, the lead situation regarding how it, I mean, that's kind of a known fact, how that impacts the brain. Sure. He's got a father who's a convicted felon who actually beat his mother. Then we've got the mother beating the sister. Then we've got, he went to second grade twice. There's all sorts of information about how limited he is intellectually, isn't there? Well, accepting everything that the defense is saying and that you just put out, Your Honor, let's judge this defendant by his actions, all right? Let's self-serve him. But in this case, the court really never gets to do that. You see it in every part of this crime, Your Honor. This crime does not reflect the transient nature of youth, impulsive behavior. This was a planned operation where the Latin kings were converging on going to high school. I'm sorry, Mr. Newman. Doesn't this whole idea of like, you know, I mean, you could call it an execution, but doesn't it almost also, can't you argue how, I mean, I hate to use the word impulsive, but, you know, the whole idea behind this gang mentality that, you know, you can, you know, shoot people and it's okay and that makes you, you know, like a grown-up, but really you're just a kid? Well, I respectfully disagree with the court on the impulsive end of it all. Your Honor, there is, there's different fights that are happening, and it's all part of the same operation. And if you look at what happened near that intersection of 87th and Exchange right before the first shots went off, he steps out from this alley while there's a distraction happening and their intended target is here. And when he has, you know, this is not just any kind of firearm. This is an assault rifle, and he, when he misses his first target, then he moves on to targets of opportunity. And if you look at what he's done with this marksmanship, Mr. Rahim Washington, being our first victim, was shot, grazing him through the head, and then shot through the back, exiting out of his chest. From there, he moves to a secondary firing position, which he enters this car in the alley, driven by another person, and chases the intended target down 87th Street westbound, shouting racial epithets at them. And again, if you look at the marksmanship in this case, we have our second victim, Mr. I'm sorry, I'm blanking his name right now. Yeah. The 13-year-old. Mr. Kendrick Pitts was shot. There's a wound on his chest, and also he's shot through the head. And the medical examiner in that situation said it would be like you'd flip a switch off. And then Johnny Edwards, our 13-year-old, again, shot through the back, running for his life. Mr. Liefblad, under the criminal code and sentencing provisions, the court actually has the there's an outline in which the court is directed to consider factors in aggravation and mitigation. There's a list. Correct. And that's actually what the trial court did in this case, did he not? Even though he didn't maybe directly consider or say I consider this the document prepared in 2009. So actually what he did do was he actually considered the statutory factors that a judge is allowed to consider when they don't impose a mandatory sentence, didn't he? I agree. So would you argue that he's done whatever is being asked of him to do when he followed the mandatory aggravating and mitigating factors that the statute allows for non-mandatory offenses? I would agree with that. Judge Goble was very, very careful at the sentencing hearing, Your Honor. So he actually considered those things that are allowed for a non-mandatory sentence when he stated what he was doing? Yes. Your Honor, if there's not any further questions at this time, Your Honor, for those reasons stated in our brief and also in our argument today, we'd ask that you affirm the defendant's conviction and also his sentence. Thank you, counsel. Just a few quick points, Your Honor. Of course. What do you think about that? About? You know the statute. It does tell the trial court what they are allowed to consider. It tells them what are mitigating factors, what are aggravating factors, and then they will impose the sentence. And that's what they do when there's not a mandatory sentence. So in this case, he actually followed the statutory guidelines for non-mandatory life sentences. So would you agree that he's actually conducted the hearing that you were looking for? No. Then why not? Because following the United States Supreme Court in Montgomery v. Louisiana, which this court discussed at length in People v. Nieto, there has to be demonstrated affirmative consideration of the individual characteristics, of the individualized characteristics of the individual, which are not part of the statutory framework. It's needing to consider the character and history of the offender, his developmental background, his impetuosity, his immaturity, his recklessness. So, no, I don't believe that there's no showing either of an affirmative consideration, because, and I wanted to correct a few points about the PSI. In the PSI, it said it reflected a single-player conviction for Martin. It specifically said that there was no abuse in his home, that no one in his family had any criminal involvement. We know that's directly contradicted by the actual detailed mitigation reports. It did not include his IQ. It did not include any facts about his bad home. And it did not include any facts about lead poisoning. So the mitigation ---- Sotomayor, what about Mr. Leiblet's remarks? He was actually present for the hearing and participated. And he said that the judge actually considered this document. What is your response to that? But the record simply does not reflect that. There's no ---- particularly, there's no evidence of any affirmative consideration. There is not a single mention of any fact apparent in that mitigation report. And unless there are other questions, thank you. Thank you, counsel. Thank you both for your excellent presentation and excellent briefing. We will take the matter under advisement. And could we call the next case, please? 15-1659, Philadelphia, 18th and Trent County. This is a case of murder and self-defense. Are we just one side today? We will take a brief recess.